**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

LARRY PHILPOT,

Plaintiff,

- vs -

MEDIA RESEARCH CENTER INC.,

Defendant.

Civil No.: 1:17-cv-00822-TSE-
MSN

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Dated: November 1, 2017

David A. Warrington
LeClairRyan, A Professional Corporation
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Phone: (703) 647-5926
Facsimile: (703) 647-5966
david.warrington@leclairryan.com
*Counsel for Media Research Center Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

BACKGROUND ............................................................................................................. 1

STATEMENT OF INDISPUTABLE FACTS ................................................................. 4

    MRC Background ....................................................................................................... 4

    Philpot Background .................................................................................................... 4

    The Chesney Photograph ........................................................................................... 5

    The Pro-Life Article .................................................................................................. 6

    The Kid Rock Photograph ......................................................................................... 8

    The Senate Article ..................................................................................................... 9

STANDARD OF REVIEW ........................................................................................... 10

ARGUMENT ................................................................................................................ 11

I.    Philpot Cannot Sue for Copyright Infringement Because He Granted
       Nonexclusive Licenses to Use the Chesney and Kid Rock Photographs ......................... 11

II.   MRC's Use of the Chesney and Kid Rock Photographs Constituted Fair Use for the
       Purposes of Comment and News Reporting ...................................................................... 13

    A.  Application of "Fair Use" Privilege ........................................................................... 13

    B.  The Purpose and Character of MRC's Use of the Photographs Were
         Transformative in That They Provided Comment and News Reporting .................... 14

        1.  MRC's Use of the Image of Kid Rock in the Senate Article Not Only Served
           a Different Purpose but Was Also Physically Transformative ............................ 18

        2.  MRC's Use of the Photographs Was Not Only Transformative but Did Not
           Serve a Commercial Purpose. ............................................................................ 19

    C.  The Nature of the Copyrighted Work ........................................................................ 20

    D.  The Amount and Substantiality of the Portion Used .................................................. 21

E.  MRC's Use Had No Effect on the Potential Market for the Photographs – No
    Such Market Even Exists ........................................................................................22

    1.  There Is No Commercial Market for the Photographs Because Philpot
        Placed His Works on the Internet for use by Others Without a Fee ................23

    2.  The Image in the Senate Article Could Never be a Substitute for the Kid
        Rock Photograph ............................................................................................25

III. MRC Was Exercising Its First Amendment Speech Rights When Using the
     Photographs ..........................................................................................................26

CONCLUSION .....................................................................................................................27

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                     <u>**Page(s)**</u>

*Am. Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994)......................................................................................24

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).......................................................................................10, 11

*Ascend Health Corp. v. Wells*,
    No. 4:12-cv-00083-BR, 2013 WL 1010589 (E.D.N.C. Mar. 14, 2013) ...........................15

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) .................................................................13, 15, 18, 20, 21

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)...................................................................................16, 20

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
    619 F.3d 301 (4th Cir. 2010) .................................................................................18, 20

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
    737 F.3d 932 (4th Cir. 2013) .........................................................................15, 21, 22, 25

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)...............................................................................................19, 20

*Caner v. Autry*,
    16 F. Supp. 3d 689 (W.D. Va. 2014) ...........................................................................15

*Celolex Corp. v. Catrett*,
    477 U.S. 317 (1986)...................................................................................................11

*Devil's Advocate, L.L.C. v. Zurich Am. Ins. Co.*,
    No. 1:13-cv-1246, 2014 WL 7238856 (E.D. Va. Dec. 16, 2014)
    *aff'd* 666 Fed. App'x 256 (4th Cir. 2016)...................................................................21

*Drauglis v. Kappa Map Grp., LLC*,
    128 F. Supp. 3d 46 (D.D.C. 2015) ...............................................................................12

*Graham v. James*,
    144 F.3d 229 (2d Cir. 1998).....................................................................................11, 13

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539, 549 (1985).........................................................................................14, 22

*Hoge v. Schmalfeldt,*
    No. ELH-14-1683, 2014 WL 30252489 (D. Md. July 1, 2014) .......................................16

*Hustler Magazine, Inc. v. Moral Majority, Inc.,*
    796 F.2d 1148 (9th Cir. 1986) ...................................................................................22, 23

*Jacobsen v. Katzer,*
    535 F.3d 1373 (Fed. Cir. 2008).........................................................................................12

*Miller v. Great Am. Ins. Co.,*
    59 F. Supp. 3d 749 (E.D. Va. 2014) .................................................................................10

*National Rifle Association of America v. Handgun Control Federation of Ohio,*
    15 F.3d 559 (6th Cir. 1994) ........................................................................................23, 25

*Nunez v. Carribean Int'l News Corp.,*
    235 F.3d 18 (1st Cir. 2000).................................................................................................16

*PaySys Int'l, Inc. v. Atos Se, Worldline SA, Atos IT Servs. Ltd.,*
    226 F. Supp. 3d 206 (S.D. N.Y. 2016)..............................................................................12

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007) ..........................................................................................18

*Princeton Univ. Press v. Michigan Document Svcs., Inc.,*
    99 F.3d 1381 (6th Cir. 1996) ............................................................................................24

*Reiner v. Nishimori,*
    No. 3:15-cv-00241, 2017 WL 1545589 (M.D. Tenn. April 28, 2017) ..............................24

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984).....................................................................................................21, 22

*Stewart v. Abend,*
    496 U.S. 207, 237 (1990).....................................................................................................20

*The Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.,*
    847 F. Supp. 385 (E.D. Va. 1994) ....................................................................................11

## OTHER AUTHORITIES

17 U.S.C. § 106A.....................................................................................................................13

17 U.S.C. § 106A(a) ...............................................................................................................13

17 U.S.C. § 107.................................................................................................................1, 14

17 U.S.C. § 107(2)..................................................................................................................20

17 U.S.C. § 107(3)..................................................................................................................21

17 U.S.C. § 107(4)..................................................................................................................22

26 U.S.C. § 501(c)(3)....................................................................................................1, 4, 19

FED. R. CIV. P. 56...........................................................................................................10, 11

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8D.03[A][1], at 8D–32.........13

Plaintiff Larry Philpot ("Philpot"), a professional photographer, took photographs of two celebrities—Kenny Chesney and Kid Rock—and placed them on the internet where they were available for use at no monetary charge.  Philpot alleges his copyrights were infringed when Media Research Center, Inc. ("MRC"), an IRS approved 501(c)(3) non-profit research and educational foundation, used the photographs in online news reporting and commentary articles about the pro-life movement and an upcoming 2018 United States Senate campaign.

MRC seeks summary judgment on two premises:  First, where copyright holders grant a nonexclusive license to their work, the appropriate remedy for failing to adhere to an obligation under that license arises out of contract, not copyright law.  Second, using versions of copyrighted photographs in articles commenting on political viewpoints and reporting on the news constitutes "fair use" of such works, and is expressly permitted under 17 U.S.C. § 107.  For the reasons discussed herein, the Court should enter judgment on Plaintiff's copyright infringement claims in favor of MRC.

## BACKGROUND

Philpot asserts two claims for copyright infringement, involving two photographs that he took depicting singers Kenny Chesney (the "Chesney Photograph") and Kid Rock (the "Kid Rock Photograph") at concert, respectively.  Dkt. No. 1 at ¶¶ 7, 10; *id.* at Exs. A, C.  Philpot claims to own the copyrights for the photographs and to have registered them with the United States Copyright Office in two separate unpublished collections in 2013.  Dkt. No. 1 at ¶¶ 8-9, 11-12.

On or about January 22, 2015, MRC published an article entitled "8 A-List Celebrities That Are Pro-Life" on its website, MRCTV.org (the "Pro-Life Article").  Dkt. No. 1 at ¶¶ 6, 13; *id.* at Ex. E.  As evident from its title, the Pro-Life Article listed eight celebrities supportive of

1

the pro-life movement and contained pictures of, quotes by, and information about each celebrity.  Dkt. No. 1 at Ex. E.   One celebrity included in the Pro-Life Article was Kenny Chesney.  *Id.*  Below the image of Kenny Chesney in the Pro-Life Article was a brief description of a song written by Kenny Chesney that conveys a pro-life message:

> Chesney wrote a song called "There Goes My Life." It is a story of a teenager whose girlfriend gets pregnant. She decides to have the baby. The teen father first believes that his life is ruined but later he realizes what a blessing and gift that child is.

*Id.*

In the Complaint, Philpot alleges that the image of Kenny Chesney in the Pro-Life Article was the Chesney Photograph and was used by MRC without obtaining a license and without permission.  *Id.* at ¶¶ 13, 15.  As such, Philpot complains that MRC's reproduction and public display of the Chesney Photograph infringed on his copyright.  *Id.* at ¶¶ 23-25.

On or about July 13, 2017, MRC published an article titled "Kid Rock Announces 2018 U.S. Senate Bid" (the "Senate Article") on MRCTV.org.  *Id.* at ¶ 17, Ex. F.  The Senate Article discussed the singer's announced campaign for election to the United States Senate.  *Id.* at Ex. F. The Senate Article included an altered version of the Kid Rock Photograph.  *Id.*  Specifically, a majority of the background was cropped and a large banner with text announcing Kid Rock's campaign was placed across the image.  *Id.*

The Kid Rock Photograph



Image Used by MRC in the Senate Article



Despite the alteration, Philpot alleges that the image in the Senate Article demonstrates that MRC used the Kid Rock Photograph without obtaining a license and without permission. *Id.* at ¶¶ 17, 19.  As such, Philpot complains that MRC's reproduction and public display of the Kid Rock Photograph infringed on his copyright.  *Id.* at ¶¶ 31-33.

3

## STATEMENT OF INDISPUTABLE FACTS

### *MRC Background*

1.      MRC is a not-for-profit research and educational foundation qualified as tax exempt under Section 501(c)(3) of the Internal Revenue Code.  Declaration of David Martin ("Martin Decl."), a copy of which is attached hereto as <u>Exhibit A</u>, at ¶ 3.

2.      MRC's mission is, in part, to expose and critique media bias against traditional American Judeo-Christian religious beliefs.  <u>Ex. A</u> (Martin Decl.) at ¶ 4.

3.      Part of MRC''s mission includes providing news and commentary about issues of public concern and debate.  *Id.* at ¶ 6.

4.      To further its mission, MRC owns and operates the website www.mrctv.org ("MRCTV").  *Id.* at ¶¶ 2, 5, 6.

5.      MRCTV is an online media platform designed to broadcast conservative values, culture, politics, liberal media bias, and entertainment to the public.  *Id.* at ¶ 7.

6.      MRC does not charge website visitors for access to MRCTV.  *Id.* at ¶ 8.

7.      MRC does not profit from maintaining and operating MRCTV.  *Id.* at ¶ 9.

8.      MRC does not publish articles and blog posts on MRCTV to generate profit; MRC publishes articles and blog posts on MRCTV to educate the public.  *Id.* at ¶ 10.

### *Philpot Background*

9.      Philpot has worked as a professional photographer since 2007 or 2008.  Transcript from October 10, 2017 Deposition of Larry G. Philpot ("Philpot Depo."), a copy of which is attached hereto as <u>Exhibit B</u>, at 10:2-5.

10.      Since becoming a professional photographer, Philpot has not held any other job. <u>Ex. B</u> (Philpot Depo.) at 37:13-19.

4

11.     The only type of photography that Philpot does professionally is photography of musical artists in concert.  *Id.* at 26:20 – 28:7.

12.     Philpot's purpose behind uploading his photographs, including the Chesney and Kid Rock Photographs, onto the Wikimedia website is to achieve greater fame, which he believes will cause his photographs to be worth more "probably" after he dies.  *Id.* at 36:12-22.

### *The Chesney Photograph*

13.     The Chesney Photograph shows Kenny Chesney performing in concert.   *Id.* at 43:4-6.

14.     Philpot took the Chesney Photograph to show Kenny Chesney performing in concert.  *Id.* at 43:14-16, 74:13-17.

15.     Philpot took the Chesney Photograph at a concert venue that he frequently attended to take photographs.  *Id*. at 74:8-20.

16.     Philpot did not take the Chesney Photograph to make any commentary on his political beliefs.  *Id.* at 44:21 – 45:2.

17.     At the time the Chesney Photograph was taken, Philpot did not know Kenny Chesney's political opinion regarding abortion.  *Id.* at 42:17-19.

18.     At some point after the Chesney Photograph was taken but before MRC published the Pro-Life Article, Philpot uploaded the Chesney Photograph to the Wikimedia website.  *Id.* at 53:6-10.

19.     Since the Chesney Photograph was uploaded onto the Wikimedia website, it was subject to a Creative Commons license granted by Philpot.  *Id.* at 59:9-13.

20. The Creative Commons license that Philpot granted as to the Chesney Photograph was a nonexclusive license to share and adapt the photograph for free. *See* Philpot's Response to Document Request No. 5, with referenced documents, attached hereto as Exhibit C.

21. Under the Creative Commons license that Philpot granted as to the Chesney Photograph, licensees were obligated to attribute Philpot as the author when distributing the photograph or any adaptation thereof. Ex. C.

22. Philpot does not know how many times he has licensed the use of or given permission for the use of the Chesney Photograph to another individual or business. Ex. B (Philpot Depo.) at 46:21 – 47:15.

23. The only money that Philpot has ever been paid in connection with the Chesney Photograph has been in response to a demand letter or in settling a copyright infringement lawsuit. *Id.* at 48:10 – 50:9.

### *The Pro-Life Article*

24. On or around January 22, 2015, MRC published the Pro-Life article on MRCTV, which was entitled "8 A-List Celebrities That Are Pro-Life." Ex. A (Martin Decl.) at ¶ 11; *see also* Dkt. No. 1 at ¶ 13.

25. A true and accurate representation of the content of the Pro-Life Article is attached to the Martin Affidavit as Exhibit A-1. *Id.* at ¶ 12; *see also* Dkt. No. 1 at Ex. E; Ex. B (Philpot Depo.) at 62:17-20.[1]

---

[1] Although the content of the Pro-Life Article is the same, the article's appearance might vary for each visit to the website due to changes in the advertisements. *See* Ex. A (Martin Decl.) at ¶ 13; Ex. B (Philpot Depo.) at 62:21 – 63:4.

26.     The Pro-Life Article listed eight celebrities supportive of the pro-life movement and contained pictures of, quotes by, and information about each celebrity. Ex. A (Martin Decl.) at ¶ 14, Ex. A-1; *see also* Dkt. No. 1 at Ex. E.

27.     The purpose of the Pro-Life Article was to expose, critique, and provide counter-commentary to the bias of mainstream media in focusing on celebrities that are supportive of the pro-abortion movement. *Id.* at ¶ 15.

28.     One of the celebrities identified in the Pro-Life Article as supporting the pro-life movement was the musician, Kenny Chesney. *Id.* at ¶ 16, Ex. A-1; *see also* Dkt. No. 1 at Ex. E.

29.     The Pro-Life Article contained an image of Kenny Chesney and discussed a song written by Mr. Chesney that supported a pro-life position on abortion. *Id.* at ¶ 17, Ex. A-1; *see also* Dkt. No. 1 at Ex. E.

30.     When Philpot learned of MRC's use of the Chesney Photograph, he did not read the Pro-Life Article. Ex. B (Philpot Depo.) at 68:16.

31.     In or around mid-June of 2017, MRC received a letter from Philpot's attorney, William Dunnegan, Esq., which MRC understood as demanding that it immediately remove the image of Kenny Chesney from the Pro-Life Article (the "Chesney Takedown Letter"). Ex. A (Martin Decl.) at ¶ 18.

32.     Immediately upon receipt of the Chesney Takedown Letter, MRC removed the image of Kenny Chesney from the Pro-Life Article. *Id.* at ¶ 19.

33.     MRC has not ever charged a visitor of the website MRCTV for access to the Pro-Life Article. *Id.* at ¶ 20.

34.     From January 22, 2015, through September 22, 2017, MRC generated a negligible amount of revenue attributable to advertisements run on the webpage displaying the Pro-Life Article, totalling approximately $16.68.  *Id.* at ¶ 21.

### *The Kid Rock Photograph*

35.     The Kid Rock Photograph shows Kid Rock performing in concert.  Ex. B (Philpot Depo.) at 75:4-6.

36.     Philpot took the Kid Rock Photograph to show Kid Rock performing in concert. *Id.* at 74:8-17, 75:4-6.

37.     Philpot took the Kid Rock Photograph at a concert venue that he frequently attended to take photographs.  *Id*. at 74:8-20.

38.     At the time the Kid Rock Photograph was taken, Philpot did not know that Kid Rock was contemplating running for the United States Senate in 2018.  *Id.* at 74:21 – 75:3.

39.     On or around September of 2013, Philpot uploaded the Kid Rock Photograph to the Wikimedia website.  *Id.* at 79:7-18.

40.     Since the Kid Rock Photograph was uploaded onto the Wikimedia website, it was subject to a Creative Commons license granted by Philpot.  *Id.* at 80:17-20.

41.     The Creative Commons license that Philpot granted as to the Kid Rock Photograph was a nonexclusive license to share and adapt the photograph for free.  *See* Philpot's Response to Document Request No. 16, with referenced documents, attached hereto as Exhibit D.

42.     Under the Creative Commons license that Philpot granted as to the Kid Rock Photograph, licensees were obligated to attribute Philpot as the author when distributing the photograph or any adaptation thereof.  Ex. D.

43.     Philpot does not know how many times he has licensed the use of or given permission for the use of the Kid Rock Photograph to another individual or business.  Ex. B (Philpot Depo.) at 77:3-14.

44.     The only money that Philpot has ever been paid in connection with the Kid Rock Photograph has been in settling copyright infringement lawsuits.  *Id.* at 77:15-18.

### *The Senate Article*

45.     On or around July 13, 2017, MRC published the Senate article on MRCTV, which was entitled "Kid Rock Announces 2018 U.S. Senate Bid."  Ex. A (Martin Decl.) at ¶ 22; Dkt. No. 1 at ¶ 17.

46.     A true and accurate representation of the content of the Senate Article is attached to the Martin Affidavit as Exhibit A-2.  *Id.* at ¶ 23; *see also* Dkt. No. 1 at Ex. F.[2]

47.     The Senate Article discussed musician Kid Rock's announced campaign for election to the United States Senate.  Ex. A (Martin Decl.) at ¶ 25; *see also* Dkt. No. 1 at Ex. F.

48.     The purpose of the Senate Article was to report on newsworthy events, particularly those that are ignored or distorted by the mainstream media.  Ex. A (Martin Decl.) at ¶ 26.

49.     The Senate Article included an image of Kid Rock that was an altered version of the Kid Rock Photograph.  *Id.* at ¶ 27; *see also* Dkt. No. 1 at Ex. F.

50.     In creating the image included in the Senate Article, MRC cropped and removed a majority of the Kid Rock Photograph, inserting a large banner with text reciting the headline for

---

[2]     Although the content of the Senate Article is the same, the article's appearance might vary for each visit to the website due to changes in the advertisements.  *See* Ex. A (Martin Decl.) at ¶ 24; Ex. B (Philpot Depo.) at 82:22 – 83:5.

the Senate Article; MRC also resized the Kid Rock Photograph.  *Id.* at ¶ 28; *see also* Dkt. No. 1 at Ex. F.

51.     Philpot has never read the Senate Article.  Ex. B (Philpot Depo.) at 68:16.

52.     When MRC was served with this lawsuit, it immediately removed the image of Kid Rock from the Senate Article.  Ex. A (Martin Decl.) at ¶ 29.

53.     Immediately upon receipt of notice of this lawsuit, MRC removed the image of Kid Rock from the Senate Article.  *Id.*  at ¶ 30.

54.     MRC has not ever charged a visitor of the website MRCTV for access to the Pro-Life Article. *Id.* at ¶ 31.

55.     From July 13, 2017, through September 22, 2017, MRC generated a negligible amount of revenue attributable to advertisements run on the webpage displaying the Senate Article, totalling approximately $9.89.  *Id.* at ¶ 21.

56.     From July 13, 2017, through October 10, 2017, MRC received approximately $50.00 total in donations from visitors to the MRCTV website, and such donations may or may not have been received through a link located on the web pages displaying the Senate Article. *Id.* at ¶ 33.

## STANDARD OF REVIEW

Summary judgment is warranted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Miller v. Great Am. Ins. Co.,* 59 F. Supp. 3d 749, 753 (E.D. Va. 2014). If evidence rebutting a motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted. *See Anderson*, 477 U.S. at 249.

Summary judgment should be entered against a non-moving party, if, after discovery is complete, the non-moving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof. . . ." *Celolex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   The moving party need only establish the absence of evidence.  *Id.* at 325.   Having made that showing, then the burden shifts to the non-moving party to set forth specific facts illustrating a genuine issue for trial.  *Id.* at 324. Furthermore, summary judgment "is appropriate for 'any part' of a claim that presents no triable issues."  *The Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.*, 847 F. Supp. 389, 394 (E.D. Va. 1994) (citing Rule 56 (as) "And 'any part' means any portion of the liability or the ***damages*** aspect of a claim." *Id.* (emphasis added)).

## ARGUMENT

### I.      Philpot Cannot Sue for Copyright Infringement Because He Granted Nonexclusive Licenses to Use the Chesney and Kid Rock Photographs

Discovery has confirmed that the Complaint tells an incomplete story of the circumstances underlying the alleged copyright infringement.  Conspicuously absent is the fact that Philpot published both the Chesney and the Kid Rock Photographs for anyone to use for free on Wikimedia.  Also absent from the Complaint is any mention of the nonexclusive license that Philpot granted as to both the Chesney and the Kid Rock Photographs.  These omissions are significant as they would have revealed that Philpot has waived his right to sue for copyright infringement.

As a matter of law, "[a] copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement."  *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998); *accord PaySys Int'l, Inc. v. Atos Se, Worldline SA, Atos IT Servs. Ltd.*, 226 F. Supp. 3d 206, 215 (S.D. N.Y. 2016).  Only where "a license is limited in

scope and the licensee acts outside the scope" can "the licensor . . . bring an action for copyright infringement." *Jacobsen v. Katzer*, 535 F.3d 1373, 1380 (Fed. Cir. 2008) (interpreting a license for use and distribution of computer software and determining that the license was "limited in scope" and that the alleged infringer's use was outside the scope of that license). Otherwise, "[a] copyright owner who grants a nonexclusive license . . . can sue only for breach of contract," not copyright infringement. *Drauglis v. Kappa Map Grp., LLC*, 128 F. Supp. 3d 46, 52 (D.D.C. 2015) (quoting *Jacobsen*, 535 F.3d at 1380).

Here, at all relevant times, the Chesney and the Kid Rock Photographs were subject to nonexclusive licenses which were not "limited in scope." In his deposition, Philpot admits that, in 2013, he placed the Chesney and the Kid Rock Photographs on Wikimedia. Ex. B (Philpot Depo.) at 53:6-10, 79:7-18. He also admits that, since placing these photographs on Wikimedia, he licensed them out for free under Creative Commons licenses. *Id.* at 59:9-13, 80:17-20; *see also* Ex. C, Ex. D. Therefore, there can be no dispute that, at the time of MRC's use of the Chesney and the Kid Rock Photographs, Philpot had granted non-exclusive licenses to share and adapt the photographs.

Although the Complaint does not mention the Creative Commons licenses, Philpot is attempting to enforce an obligation created exclusively by those licenses – that is, the right to be credited as the author of the Chesney and the Kid Rock Photographs. *See* Dkt. No. 1 at ¶¶ 16, 20. The Creative Commons licenses that Philpot granted as to the Chesney and the Kid Rock Photographs require that the licensee attribute these photographs. *See* Exs. C, D.

However, under copyright law, there is no obligation for a licensee to credit an author of a copyrighted work. *See generally* 17 U.S.C. § 106A; *Graham v. James*, 144 F.3d at 236

12

(finding that failure to credit the author with the copyright "did not itself amount to copyright infringement"). To the contrary:

> The generally prevailing view in this country under copyright law has been that an author who sells or licenses her work does not have an inherent right to be credited as author of the work. In line with that general rule, it has been held not to infringe an author's copyright for one who is licensed to reproduce the work to omit the author's name.

*Graham v. James*, 144 F.3d at 236 (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8D.03[A][1], at 8D–32). MRC has in no way prevented Philpot from exercising his right to "claim authorship" of the photographs. *See* 17 U.S.C. § 106A(a) (granting copyright holders the right to claim authorship of their work).

Nevertheless, Philpot believes that, by ignoring the Creative Commons licenses in his Complaint, he can seek the more favorable damages set forth under the Copyright Act – namely, any profits that MRC may have realized arising from the infringement as well as statutory damages. Not so. Philpot cannot genuinely dispute that, prior to MRC's use of the Chesney and Kid Rock Photographs, he granted nonexclusive Creative Commons licenses for both photographs. Thus, any recourse available to Philpot arises under contract law and he is precluded from maintaining his copyright infringement claims.[3]

## II.   MRC's Use of the Chesney and Kid Rock Photographs Constituted Fair Use for the Purposes of Comment and News Reporting

### A. Application of "Fair Use" Privilege

Fair use is "traditionally regarded" as "'a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent.'" *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 637 (4th Cir. 2009) (citing *Harper & Row,*

---

[3]   This defect is not a mere technicality and it cannot be corrected. Should Philpot's copyright infringement claims be dismissed, the Court would no longer have subject matter jurisdiction over this dispute.

*Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549 (1985)).  Section 107 of the Copyright Act

lists several of the quintessential examples of what constitutes "fair use" of a copyrighted work:

"[T]he fair use of a copyrighted work . . . for purposes such as criticism, **comment**, **news**

**reporting**, teaching . . . , scholarship, or research, is not an infringement of copyright."   17

U.S.C. § 107 (emphasis added).

> Four factors determine whether the "fair use" privilege applies:
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)  the effect of the use upon the potential market for or value of the copyrighted work.

*Id.*

The § 107 factors are not exclusive.  *Harper & Row*, 471 U.S. at 560.  '"[S]ince the

doctrine is an equitable rule of reason, no generally applicable definition is possible, and each

case raising the question must be decided on its own facts.'"  *Id.*  (citation to legislative history

omitted).  However, under the circumstances in which MRC used the Chesney and Kid Rock

Photographs, the balance of the § 107 factors weighs substantially in favor of fair use.

Accordingly, the Court should grant summary judgment in favor of MRC.

### B. The Purpose and Character of MRC's Use of the Photographs Were Transformative in That They Provided Comment and News Reporting

There can be no genuine dispute that MRC's purpose behind the Pro-Life and Senate

Articles – including the images therein – was to provide commentary on divisive political issues

and report on newsworthy events.  MRC's purpose is not only evident from the face of the

articles themselves, but it is further supported by the testimony of MRC's corporate representative.  These are transformative purposes under the Copyright Act.

Explaining the "purpose and character of the use" factor, the Fourth Circuit has stated as follows:

> The first fair use factor focuses on the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.  The preamble to § 107 lists examples of uses that are fair: criticism, comment, news reporting, teaching . . . scholarship, or research.  These examples serve as a guide[ ] for analysis under the first factor.  The essential inquiry under the first factor can be separated into two parts: whether the new work is transformative, and the extent to which the use serves a commercial purpose.

*Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 939 (4th Cir. 2013) ("*Bouchat 2013*") (internal quotation marks and citations omitted).

"A 'transformative' use is one that employ[s] quoted matter in a different manner or for a different purpose from the original, thus transforming it."  *A.V. ex rel. Vanderhye*, 562 F.3d at 638 (internal quotation marks and citation omitted).  "Transformative works rarely violate copyright protections because the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works.  Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright."  *Bouchat 2013*, 737 F.3d 939 (internal quotation marks and citations omitted).

Courts in this circuit and beyond have found that transforming the purpose of a work is a "transformative use."  *See Caner v. Autry*, 16 F. Supp. 3d 689, 710 (W.D. Va. 2014) (defendant posted video of plaintiff's statements along with contrasting statements, writings and speeches made by plaintiff for "the transformative purpose of criticizing" plaintiff); *Ascend Health Corp., UHP, LP v. Wells*, No. 4:12-cv-00083-BR, 2013 WL 1010589, at *12-14 (E.D. N.C. Mar. 14, 2013) (transformative use of photos of psychiatric facility where images originally used "to convey that they provide quality healthcare services to attract potential customers" and defendant

used "to criticize the two companies"); *Hoge v. Schmalfeldt*, No. ELH-14-1683, 2014 WL 3052489, at *13-14 (D. Md. July 1, 2014) (transformative use for preliminary injunction where comments from plaintiff's website republished in online and print publications along with commentary); *Nunez v. Carribean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) (newspaper's use of model's photographs with editorial commentary "used the works for a further purpose, giving them a new meaning or message" and "transformation of the works into news—and not the mere newsworthiness of the works themselves—that [made the use transformative]") (internal quotation marks and citations omitted); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (finding use of reproduced Grateful Dead concert posters in biography transformative use and noting "[the] purpose in using the copyrighted images at issue . . . is plainly different from the original purpose for which they were created.")

Here, MRC's use of the images was transformative because Philpot's purpose in taking the photographs could not be more distinct from MRC's. At the time they were taken, Philpot intended to capture musicians at concert in some creative manner. He has worked as a professional photographer since around 2007 or 2008, and has not held any other job. Ex. B (Philpot Depo.) at 10:2-5, 37:13-19. As a professional photographer, he exclusively photographed musical artists in concert. *Id.* at 26:20 – 28:7. In fact, both the Chesney and Kid Rock Photographs were taken at a concert venue that he frequently attended to take photographs. *Id.* at 74:8-20.

However, MRC's purpose for using the Chesney and Kid Rock Photographs was dramatically different. Overall, MRC used these images for two quintessential fair use purposes – news reporting and commentary on issues of public concern. *See* Ex. A (Martin Decl.) at ¶¶ 4,

6, 7, 10, 15, 26, 34, and 35.  At no point did MRC use the images to discuss the concerts at which the musicians were performing in the photographs, or any concerts at which the musicians performed.

Rather, MRC published the Pro-Life Article to expose, critique, and provide counter-commentary to the bias of mainstream media in focusing mainly on celebrities that are supportive of the pro-abortion movement.  *Id.* at ¶ 15.  And, MRC published the Senate Article to report on Kid Rock's announced campaign for election to the United States Senate.  *Id.* at ¶ 26.

Indeed, the photographs were surrounded by additional images and texts that had nothing to do with the concerts at which those musicians were playing when the Chesney and Kid Rock Photographs were taken.  *Id.* at Ex. A-1, Ex. A-2.  Rather, the Senate Article reported about Kid Rock's senate campaign, includes quotes from the singer about various political issues, and provided background information about the Senate seat.  *Id.* at ¶ 25, Ex. A-2.  The Pro-Life Article included photographs of eight celebrities, highlights each celebrity's support of the pro-life movement and includes website links to the statement or information.  *Id.* at ¶¶ 14, 16, and 17, Ex. A-1.  Neither use by MRC had anything to do with music, concerts, or performing; the articles were about the pro-life movement and an upcoming United States Senate race and the candidate and issues likely to be important in that race.

As further evidence of the differing purposes for MRC's use of the photographs, Philpot was not even aware of the issues on which the Pro-Life and Senate Articles reported. At the time the Chesney Photograph was taken, Philpot did not know Kenny Chesney's political opinion regarding abortion.  Ex. B (Philpot Depo.) at 42:17-19.  At the time the Kid Rock Photograph

was taken, Philpot did not know that Kid Rock was contemplating running for the United States Senate in 2018. *Id.* at 74:21 – 75:3.[4]

Accordingly, there cannot be a genuine dispute that MRC's use of images was transformative. As such, the first fair use factor weighs substantially in favor of MRC.

      1.   MRC's Use of the Image of Kid Rock in the Senate Article Not Only Served a Different Purpose but Was Also Physically Transformative

Physical alteration of the photographs is not necessary for a finding of fair use. *See Bouchat v. Baltimore Ravens Ltd. P'ship,* 619 F.3d 301, 314 (4th Cir. 2010) (*Bouchat 2010*) (concluding use of a copyrighted sports logo in a museum-like setting added "'something new' to its original purpose as a symbol identifying the [sports team]." (citation omitted)); *A.V. ex rel. Vanderhye*, 562 F.3d at 639 ("The use of a copyrighted work need not alter or augment the work to be transformative in nature. . . [Defendant's] use of plaintiffs' works had an entirely different function and purpose than the original works; the fact that there was no substantive alteration to the works does not preclude the use form being transformative in nature."); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) ("[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function than the original work." (citation omitted)). Nevertheless, it is significant that MRC did alter the Kid Rock Photograph significantly to generate the image used in the Senate Article.

Here, Philpot cannot dispute that the Senate Article included an image of Kid Rock that was an altered version of the Kid Rock Photograph. <u>Ex. A</u> (Martin Decl.) at ¶ 27; *see also* Dkt. No. 1 at Ex. F. Specifically, in creating the image included in the Senate Article, MRC cropped out a majority of the photograph, resized the image, and inserted a large banner with text reciting the headline. <u>Ex. A</u> (Martin Decl.) at ¶ 28; *see also* Dkt. No. 1 at Ex. F. Because half of the Kid

---

[4]     Nor could he have, as the story broke approximately five (5) years after Philpot took the Kid Rock Photograph.

Rock Photograph was cropped out, resized, and positioned with text, the physical changes MRC made to Philpot's work independently support a finding of transformative use.

> 2. MRC's Use of the Photographs Was Not Only Transformative but Did Not Serve a Commercial Purpose

With respect to the "commercial purpose" analysis the Supreme Court has stated: "[t]he more transformative the new work, the less will be significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994). In light of the clear transformative purpose of MRC's use of the dispute images, MRC submits that the Court's "commercial purpose" analysis is less significant.

Notwithstanding transformative use, MRC's use of the images could not be characterized as commercial. As an initial matter, MRC is a nonprofit organization that is qualified as tax exempt under Section 501(c)(3) of the Internal Revenue Code. Ex. A (Martin Decl.) at ¶3. As a whole, the organization's mission is not to increase profits, but to expose and critique media bias against traditional American Judeo-Christian religious beliefs. *Id.* at ¶¶ 4, 6. With respect to MRCTV, MRC operated this website in furtherance of this mission, "to broadcast conservative values, culture, politics, liberal media bias, and entertainment to the public," and to educate the public. *Id.* at ¶¶ 2, 5, 6, 7, 10.

Notably, MRC does not maintain MRCTV to seek profits and does not, in fact, profit from maintaining MRCTV. *Id.* at ¶¶ 9, 10. MRC does not charge visitors for access to review its articles or otherwise profit from the posting of the images. *Id.* at ¶¶ 8, 20, 31.

Likewise, MRC does not publish articles and blog posts on MRCTV to generate profits, but to educate the public on issues that are consistent with its mission. *Id.* at ¶ 10. With respect to the Pro-Life Article, MRC did not profit from publishing this article only generating negligible ad-based revenue from January 22, 2015, through September 22, 2017. *Id.* at ¶ 21.

With respect to the Senate Article, MRC did not profit from publishing this article either, again only generating negligible ad-based revenue from July 13, 2017, through September 22, 2017, and **at most**, $50.00 in donations that **may** have been attributable from visitors to the webpage displaying the Senate Article. *Id.* at ¶¶ 32, 33.

Assuming *arguendo* that MRC's use of the photograph resulted in some minimal benefit through unrelated advertising appearing off to the side on the same web page displaying the Pro-Life and Senate Articles, this would be insufficient to demonstrate that MRC published these articles for a "commercial purpose," particularly given that MRC did not profit from either article. Even if the Court were to find a negligible commercial purpose to MRC's publishing these articles, the transformative use of the images outweighs finding against fair use. *See Campbell*, 510 U.S. at 579.

Therefore, the first factor weighs substantially in favor of a fair use finding.

### C. The Nature of the Copyrighted Work

The second factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). "In considering the nature of the copyrighted work, the Supreme Court has instructed that 'fair use is more likely to be found in factual works than in fictional works,' whereas 'a use is less likely to be deemed fair when the copyrighted work is a creative product.'" *A.V. ex rel. Vanderhye*, 562 F.3d at 640 (citing *Stewart v. Abend*, 496 U.S. 207, 237 (1990)).

"'[T]he second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose.'" *Bouchat 2010,* 619 F.3d at 315 (citing *Bill Graham Archives*, 448 F.3d at 612). As discussed above, the transformative use of the photographs was to provide commentary about an issue of public concern and debate, i.e. abortion, and to report on newsworthy events, such as a celebrity announcing his 2018 United States Senate campaign.

Because the photographs merely depict Kenny Chesney and Kid Rock performing, the images are more factual than creative.  MRC's use only for identification purposes supports the finding that these are mere factual works, rather than creative products.   Furthermore, MRC's transformative use undermines any argument to the contrary.  This factor should be viewed as slightly favorable towards a finding that MRC's use of the photographs constitutes fair use.

### D.  The Amount and Substantiality of the Portion Used

The third fair use factor is the "amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3). "At a high level of generality, as the amount of copyrighted material that is used increases, the likelihood of fair use decreases." *Devil's Advocate, L.L.C. v. Zurich Am. Ins. Co.*, No. 1:13-cv-1246, 2014 WL 7238856, at *6 (E.D. Va. Dec. 16, 2014) *aff'd* 666 Fed. App'x 256 (4th Cir. 2016).   However, that does not preclude a fair use finding.  "[T]hat the entire work is reproduced . . ., does not have its ordinary effect of militating against a finding of fair use."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984).

As the Fourth Circuit has recognized,

Ultimately, the extent of permissible copying varies with the purpose and character of the use.  Here, the [alleged infringer] had no choice but to [use] the whole [work] in order to fulfill its legitimate transformative purpose of creating the historical videos at issues. Though [the infringer] used [the work] in its entirety, the transformativeness of the use and the character of [the work] lead us to give very little weight to this factor.  It would be senseless to permit [the alleged infringer] to use [the work] for factual, historical purposes, but permit it to show only a half, or two-thirds of it.

*Bouchat 2013*, 737 F.3d at 943 (internal quotation marks and citations omitted).

Although Philpot claims that MRC used the entire Chesney Photograph, there can be no dispute that only a cropped portion of the Kid Rock Photograph was used in the header of the Senate Article.  Regardless of how much each photograph was used, as demonstrated above,

MRC's alleged infringement was a transformative use to make political speech/commentary and news reporting.  Therefore, MRC's transformative use outweighs the amount of the works used and this factor weighs in favor of, or is neutral against, a fair use finding.

### E.  MRC's Use Had No Effect on the Potential Market for the Photographs – No Such Market Even Exists

The "market effect" factor requires courts to determine "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  The Supreme Court has described this as "the single most important element of fair use."  *Harper & Row*, 471 U.S. at 566.  In contrast, "a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create."  *Sony Corp.*, 464 U.S. at 450 (1984).

In evaluating this factor the Fourth Circuit has stated, "[w]e are required to determine whether the defendants' [use of the work] would materially impair the marketability of the work and whether it would act as a market substitute for it.  A transformative use renders market substitution less likely and market harm more difficult to infer."  *Bouchat 2013*, 737 F.3d at 943 (internal quotation marks and citations omitted).

There are two analogous circuit court cases where this factor was conclusive in determining whether the fair use privilege applied.  In *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148 (9th Cir. 1986), the court held that the Moral Majority's almost verbatim copying of a parody of the Rev. Jerry Falwell from *Hustler* magazine in a mailing sent for fund-raising purposes was a fair use.  In so ruling, the Ninth Circuit recognized that, while the Moral Majority raised over a million dollars with its mailing, any commercial benefit was far outweighed by the fact that the Moral Majority used the parody to generate moral outrage among its members and to stimulate monetary and other support for its political causes.  The court ruled

that the Moral Majority's use "could not have diminished any potential sales, interfered with the marketability of the parody or fulfilled the demand for the original work." *Id.* at 1156. "Therefore, . . . Defendants have rebutted any presumption of unfair exploitation of Hustler's copyright monopoly." *Id.*

This case is also similar to *National Rifle Association of America v. Handgun Control Federation of Ohio*, 15 F.3d 559 (6th Cir. 1994). There, the Handgun Control Federation ("HCF") sent a newsletter to its members attempting to arouse support for a bill that the NRA opposed that contained two pages of material photocopied from an NRA mailing. *Id.* at 560. The Sixth Circuit held that it had "no hesitation in finding a fair use here, for all the factors point in that direction." *Id.* at 561.

> HCF's use of the [copyrighted material] was noncommercial. HCF, a non-profit organization, made no attempt to sell the [material] . . . [and] it is doubtful it could be profitably sold. HCF used the [material] only to further its own lobbying goals. It is also difficult to see how the use could harm NRA's "market." . . . HCF's use of the [material], if it did anything, helped *create* a market for the NRA, as citizens on one side of a controversial issue presumably feel more need to engage in political activity if citizens on the other side of the issue are active. . . . The [material] was used primarily in exercising HCF's First Amendment speech rights to comment on public issues and to petition the government regarding legislation. *The scope of the fair use doctrine is wider when the use relates to issues of public concern.*

*Id.* at 562 (emphasis added). This reasoning is equally applicable here.

> 1. There Is No Commercial Market for the Photographs Because Philpot Placed His Works on the Internet for Use by Others Without a Fee

With regard to the Chesney and Kid Rock Photographs, there can be no genuine dispute that there is no market for Philpot to profit off of these works, rendering it impossible for MRC's use of the photographs to have an adverse effect. Philpot made these photographs readily available to users free of charge. Simply arguing that the works were available for licensing is

insufficient.   Indeed, the U.S. District Court for the Middle District of Tennessee reached a

similar conclusion with analogous facts:

> Here, Reiner has not established any market harm from Watkins' use of "Casablanca." Reiner argues that the effect of the market is that "Casablanca" was available for licensing and Defendants chose to use the photograph without paying for a license. (Doc. No. 54 at 47.) This does not satisfy his burden to show a negative market effect. *Princeton Univ. Press*, 99 F.3d at 1387 (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929–31 (2d Cir. 1994)). As a preliminary matter, Reiner has not proven even that there is a market for photographs to be used as part of educational design exercises. Reiner, in fact, has not produced evidence of a single instance in which he or anyone else was voluntarily paid for the right to use a photograph in a student-created mock advertisement or other student design project. Reiner has not proven that widespread use of photographs in the manner of Watkins or Nishimori would adversely affect any potential market for his work.

> Reiner did not prove that such a revenue stream or market exists for photographs such as "Casablanca." Reiner also did not show that any other professor purchased a license to use "Casablanca," or that schools generally purchase licenses. Instead, he shows that Watkins changed its policy to upload Creative Commons photographs for free—a fact that significantly diminishes the argument that Watkins' use had any negative market affect. As such, this factor weighs strongly in favor of finding that Watkins' educational use of the photograph was fair use.

*Reiner v. Nishimori*, No. 3:15-cv-00241, 2017 WL 1545589, at *7 (M.D. Tenn. April 28, 2017).

Here, Philpot cannot demonstrate that a market exists for his photographs or that he

enjoyed a revenue stream from licensing his works.   To the contrary, he admits that, after taking

the photographs but before MRC's use, he uploaded the works to the Wikimedia website which

permitted them to be downloaded, used, and even adapted for free.   Ex. B (Philpot Depo.) at

53:6-10, 79:7-18.   Philpot admits that the purpose behind uploading his photographs onto the

Wikimedia website was not to generate any profits in his lifetime, but to achieve greater "fame,"

which he believes will cause his photographs to be worth more "probably" after he dies.   *Id.* at

36:12-22.   As such, Philpot does not know how many times he has licensed the use of or given

permission for the use of the Chesney and Kid Rock Photographs to another individual or business. *Id.* at 46:21 – 47:15, 77:3-14.

In fact, the only money that Philpot has ever been paid in connection with the photographs has been in response to one or more demand letters, settling a threatened or filed copyright infringement lawsuit. *Id.* at 48:10 – 50:9; 77:15-18. However, litigation is not a commercial market contemplated by the Copyright Act. Even if it were, Philpot would not be able to credibly argue that MRC harmed this "market," as MRC's use would be helping to ***create*** it. *See National Rifle Association of America,* 15 F.3d at 562.

        2. The Image in the Senate Article Could Never Be a Market Substitute for the Kid Rock Photograph

Notwithstanding the indisputable fact that there is no market for the photographs, Philpot cannot demonstrate that MRC's use of the Kid Rock Photograph had an adverse effect. As held by the Fourth Circuit, this Court must determine whether MRC's use of the work "would materially impair the marketability of the work" and " would act as a market substitute for it." *Bouchat 2013*, 737 F.3d at 943 (internal quotation marks and citations omitted). However, a cursory glance at the image used in the Senate Article reveals that it could not "act as a market substitute" for the Kid Rock Photograph. For reference, these images are reproduced below:

The Kid Rock Photograph



Image Used by MRC in the Senate Article



### III.   MRC Was Exercising Its First Amendment Speech Rights When Using the Photographs

MRC's use of the photographs exercised its First Amendment right to free speech and is a fair use.  MRC used the photographs to report on newsworthy issues and comment on those news items pertinent to the pro-life movement and an upcoming senate campaign.  Similar to HCF, its use was not commercial and there was no attempt to sell or otherwise profit from the use.  Ex. A (Martin Decl). at ¶¶ 5, 8-10.  Nor is there any evidence that MRC's use affected any potential market for the photographs.

## <u>CONCLUSION</u>

WHEREFORE, for the forgoing reasons, summary judgment in this matter should be entered in favor of MRC and against Plaintiff, and MRC should be permitted to file a petition for its reasonable attorneys' fees pursuant to 17 U.S.C. § 505.


Dated: November 1, 2017                    Respectfully submitted,

                                           */s/ David A. Warrington*
                                           David A. Warrington (VSB 72293)
                                           LeClairRyan, A Professional Corporation
                                           2318 Mill Road, Suite 1100
                                           Alexandria, Virginia 22314
                                           Phone: (703) 647-5926
                                           Facsimile: (703) 647-5966
                                           david.warrington@leclairryan.com
                                           ***Counsel for Media Research Center Inc.***

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on November 1, 2017, I electronically filed the foregoing

with the Court's CM/ECF system, which will send a copy of the foregoing on the following.

Peter J. Riebling
1717 Pennsylvania Avenue, N.W.
Suite 1025
Washington, D.C. 20006-3591
peter.riebling@rieblinglaw.com
*Counsel for Larry Philpot*

*/s/ David A. Warrington*
David A. Warrington
LeClairRyan, A Professional Corporation
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Phone: (703) 647-5926
Facsimile: (703) 647-5966
david.warrington@leclairryan.com
**Counsel for Media Research Center Inc.**