**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

LARRY PHILPOT,

                    Plaintiff,

        - vs -

MEDIA RESEARCH CENTER INC.,

                  Defendant.

Civil No.: 1:17-cv-00822-TSE-MSN

## REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated: November 22, 2017

David A. Warrington
Alexander R. Green
LeClairRyan, A Professional Corporation
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Phone: (703) 647-5926
Facsimile: (703) 647-5966
david.warrington@leclairryan.com
alexander.green@leclairryan.com
*Counsel for Media Research Center Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

ARGUMENT ................................................................................................................... 2

   I.   MRC Should Be Granted Summary Judgment on Its Fair Use Defense ........................... 2

        A.  First Fair Use Factor:  There Is No Dispute That the Purpose and Character
of MRC's Use of the Photographs Was for Comment and News Reporting ............... 3

              1.  The Pro-Life and Senate Articles Transform the Purpose of the
Photographs from Depicting Musicians at Concert to Commenting on
Political Issues and Reporting on Current Events ............................................... 4

              2.  Transformative Use of Philpot's Photographs Does Not Require Comment
or New Reporting of the Photographs Themselves ........................................... 7

              3.  MRC's Use of the Image of Kid Rock in the Senate Article Was Also
Physically Transformative ............................................................................... 10

              4.  The Fact That MRC's Articles Generated a Minimal Amount of Ad-Based
Revenue and Donations Does Not Sufficiently Support That MRC's Use
of the Photographs Did Not Serve a Commercial Purpose .............................. 12

        B.  Second Fair Use Factor:  This Factor Weighs in MRC's Favor Because MRC's
Use Was for Factual Identification Purposes ................................................................. 14

        C.  Third Fair Use Factor:  This Factor Is, at Most, Neutral to the Court's Fair Use
Analysis in Light of MRC's Transformative Use .......................................................... 14

        D.  Fourth Fair Use Factor:  There Was No Market for Philpot's Photographs;
Thus, This Factor Weighs Heavily in Favor of a Finding of Fair Use ....................... 15

              1.  Philpot Cannot Argue That the Nonexclusive Licenses Do Not Apply,
but Then Rely on the Attribution Provision in the Nonexclusive Licenses
to Manufacture an Artificial "Market" for His Photographs .......................... 16

   II.  MRC Should Be Granted Summary Judgment on Its License Defense ........................... 18

   III. An Award of Attorneys' Fees Is Particularly Appropriate in Light of Philpot's Failure
to Acknowledge the Nonexclusive Licenses in His Initial Pleading ............................... 20

CONCLUSION .............................................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                    **<u>Page(s)</u>**

*American Geophysical Union v. Texaco, Inc.*,
    60 F.3d 913 (2d Cir. 1994)............................................................................13

*Authors Guild v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015), *cert. denied sub nom. The Authors Guild v. Google, Inc.*,
    136 S. Ct. 1658 (2016)..................................................................................3

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) .............................................................2, 5, 13, 14

*Barcroft Media, LTD., v. Coed Media Group, LLC*,
    No. 16-cv-7634, 2017 WL 5032993 (S.D. N.Y. Nov. 2, 2017)....................9, 10

*Balsley v. LFP, Inc.*,
    691 F.3d 747 (6th Cir. 2012) ...........................................................................11

*Bill Graham Archives v. Dorling Kindersley, Ltd.*,
    448 F.3d 605 (2d Cir. 2006)..................................................................5, 8, 10, 14

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
    619 F.3d 301 (4th Cir. 2010) ..............................................................8, 9, 10, 14

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
    737 F.3d 932, 939 (4th Cir. 2013)........................................................4, 14, 15

*BWP Media USA, Inc. v. Gossip Cop Media, Inc.*,
    196 F. Supp. 3d 395 (S.D. N.Y. 2016).............................................................10

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)..............................................................................5, 7, 12, 13

*Cleveland v. Policy Mgmt. Sys. Corp.*,
    526 U.S. 795 (1999)........................................................................................7

*Crump v. QD3 Entm't, Inc.*,
    No. 10-civ-3564, 2011 WL 446296 (S.D. N.Y. Feb. 8, 2011) .........................19

*Day v. D.C. Dep't of Consumer & Regulatory Affairs*,
    191 F.Supp.2d 154 (D. D.C. 2002).................................................................15

*Graham v. James*,
    144 F.3d 229 (2d Cir. 1998)......................................................................16, 18

*Jacobsen v. Katzer*,
    535 F.3d 1373 (Fed. Cir. 2008)....................................................................17, 18

*Lasica v. Am. Online, Inc.*,
    No. 15-cv-4230-GW, 2015 WL 12791494 (C.D. Cal. Oct. 8, 2015) ...............................18

*National Rifle Association of America v. Handgun Control Fed'n of Ohio*,
    15 F.3d 559 (6th Cir. 1994) ...........................................................................17

*Nunez v. Carribean Int'l News Corp.*,
    235 F.3d 18 (1st Cir. 2000)...........................................................................9

*Saxelbye Architects, Inc. v. First Citizens Bank & Tr. Co.*,
    No. 96-2766, 1997 WL 702290 (4th Cir. Nov. 3, 1997) ....................................19

*Sony Corp. of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)..............................................................................12, 13

## OTHER AUTHORITIES

17 U.S.C. § 106A..........................................................................................16

17 U.S.C. § 106A(a) .....................................................................................16

17 U.S.C. § 107............................................................................................2, 3, 4

17 U.S.C. § 107(4) .......................................................................................15

17 U.S.C. § 505............................................................................................20, 21

Media Research Center, Inc. ("MRC") presented two independent grounds for granting summary judgment in its favor and against Plaintiff Larry Philpot ("Philpot").  First, despite Philpot's failure to even mention this fact in his Complaint, MRC demonstrated that Philpot granted nonexclusive licenses to all individuals to share and adapt the Chesney and Kid Rock Photographs.  So long as MRC was acting within the scope of the nonexclusive licenses, Philpot cannot maintain an action for copyright infringement as a matter of law.

Second, even if the nonexclusive licenses did not apply, MRC's use constituted a "fair use."  MRC demonstrated that, by using versions of the copyrighted photographs in articles commenting on political viewpoints and reporting on newsworthy events, MRC's use was transformative of the original purpose behind Philpot's taking of the photographs—to depict two musicians at concert.  Moreover, Philpot is unable to show that MRC's use harmed any potential market for his photographs, because no such market exists.  The only economic benefit realized by Philpot from his photographs arises from settling copyright infringement claims.

In response, Philpot fails to raise any genuine dispute as to the material facts that support MRC's fair use and license defenses.  Instead, he attempts to obscure MRC's Motion by misinterpreting the case law discussing these defenses.

Regarding the fair use defense, Philpot cannot ignore that the purpose behind MRC's use of the photographs was transformative of his original purpose and that MRC's use had no adverse economic effect on any market for the photographs.  Rather, he permitted everyone to use these photographs without collecting any fee.

Regarding the license defense, Philpot has finally directed this lawsuit to where it should have begun—he argues that he can maintain a lawsuit for copyright infringement because he believes that the nonexclusive licenses terminated automatically when MRC published the

1

images of Kenny Chesney and Kid Rock without attributing the original photographs to him. However, in so arguing, Philpot ignores the express language of the nonexclusive Creative Commons licenses, which provides that MRC is nonetheless entitled to the fair use of the copyright works without being required to attribute such works.

## ARGUMENT

### I.   MRC Should Be Granted Summary Judgment on Its Fair Use Defense

Given the lack of any dispute of the material facts supporting MRC's fair use defense, the Court need not impanel a jury in this lawsuit.  MRC's Motion for Summary Judgment demonstrated that the four factors identified in Section 107 of the Copyright Act (the "Act") weigh substantially in favor of fair use.  Dkt. No. 26 at 13-26.  Critical to the Court's fair use analysis is the transformative purpose of MRC's use of the Chesney and Kid Rock Photographs – specifically, to provide commentary on divisive political issues and report on newsworthy events.  *See id.* at 14-18.  In his Opposition, Philpot argues that fair use presents a "question of fact," but fails to raise any genuine dispute of the material facts identified by MRC.  Thus, Philpot has failed to adequately rebut MRC's Motion for Summary Judgment.

As a matter of law, MRC enjoys the right to the fair use of copyrighted works, even without the author's consent.  *See A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 637 (4th Cir. 2009).  Significantly, comment and news reporting are two quintessential examples of fair use under the Act.  17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . for purposes such as criticism, **comment**, **news reporting**, teaching . . . , scholarship, or research, is not an infringement of copyright.") (emphasis added).

The law underlying the Court's fair use analysis is clear.  There are four factors that the Court should consider when determining fair use: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used; and (4)

2

the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. Over the years, the Supreme Court has placed greater weight on the first and fourth factors. *See Authors Guild v. Google, Inc.*, 804 F.3d 202, 213–14 (2d Cir. 2015), *cert. denied sub nom. The Authors Guild v. Google, Inc.*, 136 S. Ct. 1658 (2016).

Rather than raise any genuine dispute as to the facts that MRC relies on in support of its fair use defense, Philpot attempts to recast the law, but his efforts to do so fails, because the law supports a finding that MRC's use of the photographs constitutes fair use.

### A. <u>First Fair Use Factor</u>: There Is No Dispute That the Purpose and Character of MRC's Use of the Photographs Was for Comment and News Reporting

Philpot is overly dismissive of the now-undisputed fact that the purpose and character of MRC's use of the photographs was for comment and news reporting, as the photographs were included in articles discussing the extremely divisive public issue of abortion and a celebrity's announcement of his campaign for the U.S. Senate. In his Opposition, Philpot admits the following material facts regarding the "purpose and character" of MRC's use of the photographs:

➢ MRC is a not-for-profit research and educational foundation. MRC Fact No. 1.[1]

➢ MRC's mission is, in part, to expose and critique media bias against traditional American Judeo-Christian religious beliefs, part of such mission includes providing news commentary about issues of public concern and debate. MRC Fact Nos. 2-3.

➢ MRC operates the website www.mrctv.org ("MRCTV") to further its mission, including broadcasting conservative values, culture, politics, liberal media bias, and entertainment to the public. MRC Fact Nos. 4-5.[2]

---

[1] For the purposes of this brief, MRC shall cite to its list of indisputable material facts by number. *See generally* Dkt. No. 26 at 4-10.

[2] Although Philpot does not dispute MRC's stated purpose behind MRCTV or the Pro-Life and Senate Article, he does posit that MRCTV and the Pro-Life and Senate Articles served the additional purpose of "generating revenue for MRC." Dkt. No. 28 at 1, 3-4. As discussed separately herein, the exceedingly small amount of ad-based revenue received by MRC from the Pro-Life and Senate Articles is insufficient to demonstrate that MRC's use of the photographs

➢ On or around January 22, 2015, MRC used the contested image of Kenny Chesney in an article entitled "8 A-List Celebrities That Are Pro-Life," which listed eight celebrities supportive of the pro-life movement, including Mr. Chesney, and discussed a song written by him that supported a pro-life position on abortion.  MRC Fact Nos. 24-26, 28-29.

➢ The purpose of the Pro-Life Article was to expose, critique, and provide counter-commentary to the bias of mainstream media in focusing on celebrities that are supportive of the pro-abortion movement.  MRC Fact No. 27.

➢ On or around July 13, 2017, MRC used the contested image of Kid Rock in an article entitled "Kid Rock Announces 2018 U.S. Senate Bid," which discussed musician Kid Rock's announced campaign for election to the U.S. Senate.  MRC. Fact No. 45-47, 49.

➢ The purpose of the Senate Article was to report on newsworthy events, particularly those that are ignored or distorted by the mainstream media.  MRC Fact No. 48.

The preamble to Section 107 of the Act specifically lists "comment" and "news reporting" as quintessential examples of fair use.  17 U.S.C. § 107.  Although the Court's analysis does not end there, the Fourth Circuit has expressly stated that the preamble to Section 107 should serve as a "guide[] for analysis" under the first fair use factor.  *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 939 (4th Cir. 2013) ("*Bouchat 2013*").

With that guidance, the Court should analyze the first fair use factor, the "purpose and character of the use," in two parts: (i) whether the new work is transformative; and (ii) the extent to which the use serves a commercial purpose.  *Id.*  For the following reasons, the first fair use factor weighs heavily in favor of MRC's use of the photographs being fair.

1. The Pro-Life Senate Articles Transform the Purpose of the Photographs from Depicting Musicians at Concert to Commenting on Political Issues and Reporting on Current Events

As noted by the Fourth Circuit, "[t]ransformative works rarely violate copyright protections . . . ."  *Bouchat 2013*, 737 F.3d at 939.  The parties agree that a use is "transformative" where the user employs the copyrighted works "in a different manner or for a

---

served a commercial purpose, particularly as there is no support that the photographs increased the revenue that MRC would have otherwise received.

different purpose from the original."  Dkt. No 26 at 15 (quoting *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 637 (4th Cir. 2009)); Dkt. No. 28 at 16-17 (citing *iParadigms*). Philpot concedes that a transformative use can arise from a change to the "expression, meaning or message" of the work.  Dkt. No. 28 at 16 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)); *see also Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 608-609 (2d Cir. 2006) (holding that a transformative use is one that adds something new with a different purpose or character, altering the original expression, meaning, or message).

Here, MRC's use of the photographs was transformative because the contested images of Kenny Chesney and Kid Rock were contained in articles that served a dramatically different purpose than that of the original works—for comment and news reporting regarding the controversial issue of abortion and a celebrity's political campaign.  In contrast, Philpot's purpose for the original works was to capture the musicians at concert:

➢ Since at least 2008, Philpot's only job has been as a professional photographer.  MRC Fact Nos. 9-10.

➢ The ***only*** type of photograph that Philpot does professionally is photography of musical artists in concert.  MRC Fact No. 11.

➢ The Chesney and Kid Rock Photographs show the musicians in concert.  MRC Fact Nos. 13, 35.

➢ Philpot took the Chesney and Kid Rock Photographs to show the musicians performing in concert.  MRC Fact Nos. 14, 36.

➢ The Chesney and Kid Rock Photographs were taken at a concert venue that Philpot frequently attended to take photographs.  MRC Fact Nos. 15, 37.

➢ Philpot did not take the Chesney Photograph to make any commentary on Mr. Chesney's political beliefs and, in fact, did not even know Mr. Chesney's political opinion regarding abortion at the time the Chesney Photograph was taken.  MRC Fact Nos. 16-17.

➢ At the time the Kid Rock Photograph was taken in 2013, Philpot did not know (nor could he know) that Kid Rock was contemplating running for the U.S. Senate in 2018.  MRC Fact No. 38.

Philpot admits all of these material facts in his Opposition.  *See* Dkt. No. 28 at 1-3.

Despite these admissions, Philpot now boldly proclaims that his and MRC's purposes for using the photographs were the same.  *Id.* at 19.  Although not mentioned in his deposition, Philpot declares in his Opposition that, in addition to the purposes identified by MRC, he took the photographs "for the purpose of visually enhancing articles about the performers."  *Id.*

Philpot cannot now salvage his claims from MRC's Motion without disputing the material facts that demonstrate Philpot's actual purpose for taking the photographs.  Nor can Philpot salvage his claims by contriving an additional purpose for his photographs years later.

Philpot's add-on purpose is inconsistent with his deposition testimony, which clearly establishes that Philpot's purpose behind taking the Chesney and Kid Rock Photographs was to show the musicians in concert and not to provide any political commentary or news reporting:

Q      Okay. And you took the photograph to show Kenny Chesney in concert; correct?

A      Yes.

Q      Any no one assigned you to take this photograph in connection with any news report or opinion piece about Kenny Chesney being Pro Life, did they?

A      No. I didn't know Kenny Chesney was Pro Life. . . .

Q      You didn't take the Chesney photograph to make any commentary on his political beliefs, did you?

A      No. . . .

Q      When did you take the Kid Rock photograph?

A      In 2013.

Q      Were you on assignment by a news organization when you took the photograph?

A      No. . . .

Q      And when you took this photograph, you didn't know that Kid Rock was contemplating running for the United States Senate in 2018, did you?

A      No.

Dkt. No. 26-2 (Philpot Depo.) at 43:14-22; 44:21 – 45:2, 74:8-12, 74:21 – 75:3.

As a matter of law, Philpot "cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

Moreover, even if Philpot had taken the Chesney and Kid Rock Photographs "for the purpose of visually enhancing articles about the performers," that newly contrived position would still be insufficient to support Philpot's bold assertion that his and MRC's purposes are the same. They are very obviously not for the same purpose. While the photographs depict two musicians in concert, MRC's articles do not discuss the concerts. Rather, MRC published the Pro-Life Article to expose, critique, and provide counter-commentary to the bias of mainstream media in focusing mainly on celebrities that are supportive of the pro-abortion movement. MRC Fact No. 27. And, MRC published the Senate Article to report on Kid Rock's announced campaign for election to the United States Senate. MRC Fact No. 47.

By using these photographs in articles containing political commentary and news, MRC dramatically altered the "expression, meaning or message" of the photographs. For that reason alone, the Court should find that the alleged use of the photographs was transformative, rendering the other fair use factors less significant. *See Campbell*, 510 U.S. at 579 ("[T]he more transformative the new work, the less will be significance of other factors, like commercialism, that may weigh against a finding of fair use.").

2.   Transformative Use of Philpot's Photographs Does Not Require Comment or New Reporting of the Photographs Themselves

Rather than raise any genuine dispute of a material fact, the Opposition focuses more on confusing the case law interpreting the "transformative" use issue. Specifically, Philpot asks this Court to adopt an exceedingly narrow interpretation of when a use is "transformative"—arguing

that there is no transformative use here because the photographs themselves were not the subject

of the Pro-Life and Senate Articles.  Dkt. No. 28 at 18-22.  Philpot argues that "to establish

transformative use based on 'news reporting' or 'commenting on issues of public concern,' a

defendant must show the copyrighted work *itself* is relevant to the newsworthy event, as opposed

to being used for the purpose intended by the copyright owner."  Dkt. No. 28 at 18-19.

There is no legal support for such a narrow interpretation of transformative use.  In fact,

several of the cases that Philpot relies upon for support of this narrow interpretation actually cut

against him.  For instance, Philpot incorrectly states that "in *Bill Graham*, and in certain uses in

*Bouchat* . . ., the defendants commented on the works themselves . . . ."  Dkt. No. 28 at 21.

*Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605 (2d Cir. 2006), involved

artistic concert posters of the band, the Grateful Dead, that were reduced in size and used in a

coffee table book about the band's history.  *Id.* at 606-608.  The Second Circuit affirmed the

finding of fair use because the publisher's "use of images (the concert posters) placed in

chronological order on a timeline is transformatively different from the mere expressive use of

images on concert posters or tickets."  *Id.* at 609.  The Second Circuit held that the images of the

posters were used to "enrich the presentation of the cultural history of the Grateful Dead, not to

exploit copyrighted artwork for commercial gain."  *Id.* at 611.  Significantly, the coffee table

book constituted a "transformative" use of the concert posters, because the book was about "the

cultural history of the Grateful Dead," not the posters themselves.

In *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301 (4th Cir. 2010) ("*Bouchat*

*2010*"), the plaintiff owned the copyright to a logo that he proposed to the Baltimore Ravens

football team, which then used a "strikingly similar logo design" for the next three years.  *Id.* at

306.  The plaintiff's challenge involved two uses of that logo: in the season highlight films sold

by the NFL and in the lobby of Ravens corporate headquarters. *Id.* at 306-07. Noting that "[a] logo is an identifying symbol," the Fourth Circuit found that its use in the highlight films was not transformative because "[t]he simple act of filming the game in which the copyrighted work was displayed did not 'add[ ] something new' to the logo." *Id.* at 309 (quoting *Campbell*, 510 U.S. at 579). However, the Fourth Circuit also found that the use of the logo in Ravens corporate headquarters was transformative partially because " use of the logo in a museum-like setting 'adds something new' to its original purpose as a symbol identifying the Ravens." *Id.* at 314. In other words, use of the logo in Ravens corporate lobby was transformative even though it did not comment on the logo itself.

Similarly, Philpot claims that *Nunez v. Carribean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000), is distinguishable because that case involved modeling photographs that "became news." *See* Dkt. No. 28 at 19-20. However, he conveniently cuts his citation to that opinion short. *See id.* Had he not, he would have revealed that the First Circuit noted that a newspaper's use of photographs "originally intended to appear in modeling portfolios" would be transformative even if the news article was not discussing the photographs themselves. *See Nunez*, 235 F.3d at 23 ("It is this transformation of the works into news—and not the mere newsworthiness of the works themselves—that weighs in favor of fair use under the first factor of § 107.").

Philpot's citation to *Barcroft Media, LTD. v. Coed Media Group, LLC*, No. 16-cv-7634, 2017 WL 5032993 (S.D. N.Y. Nov. 2, 2017), is of no help to him. It involved paparazzi photographs, which the court found "are designed to document the comings and goings of celebrities, illustrate their fashion and lifestyle choices, and accompany gossip and news articles about their lives." *Id.* at *6. The defendant used those photographs by either displaying them with no text or by including them in articles that described the subject matter depicted in the

photographs.  *See id.*  Thus, the defendant's use was "consistent with the original intent behind

taking and copyrighting the images" documenting the comings and goings of celebrities.  *Id.*

In *Barcroft Media*, unlike here, the copyrighted works and the articles both described the

same events, justifying that court's refusal to finding a "transformative" purpose.  *See id.*

("Defendant confuses the situation in which the photograph is the story . . . and the scenario

present here, in which the contents of the photograph are of some public interest. . . .

Newsworthy contents will rarely justify unlicensed reproduction; were it otherwise,

photojournalists would be unable to license photos, and would effectively be out of a job.")

(quoting *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 406 n.6 (S.D.

N.Y. 2016)).  For MRC's use to be similar to the use in *Barcroft Media*, MRC would have had to

publish articles about the concerts depicted in the Chesney and Kid Rock Photographs.

However, that is not what the Pro-Life and Senate Articles discuss.

As demonstrated by *Bill Graham* and *Bouchat 2010*, the setting in which the works

appear is significant to the Court's analysis of transformative use.  Philpot took the photographs

to depict musicians at concert, whereas MRC used the contested images in articles that provide

commentary and news reporting.  Accordingly, the Court should find that MRC's use of the

images was transformative and that the first fair use factor weighs heavily in MRC's favor.

      3.   MRC's Use of the Image of Kid Rock in the Senate Article Was Also
           Physically Transformative

The Opposition fails to rebut that MRC's use of the Kid Rock Photograph was physically

transformative. In its Motion for Summary Judgment, MRC explained that the contested image

of Kid Rock was an altered version of the Kid Rock Photograph, in that MRC cropped out a

majority of the photograph, resized the image, and inserted a large banner with text reciting the

article's headline.  MRC Fact Nos. 49-50.  In response, Philpot admits that MRC did crop out a

portion of the Kid Rock Photograph, that MRC resized the image, and that MRC inserted the headline into the image.  Dkt. No. 28 at 4-5.  However, he complains that "MRC reproduced the uncropped, unbannered, Kid Rock Photograph . . . and publicly displayed it at the Kid Rock Photograph URL."  *Id.*  Philpot also disputes that a "majority" of the photograph was cropped out and argues that MRC's physical alteration did not change the photograph's meaning.  *Id.*

As an initial matter, Philpot's reference to the "Kid Rock Photograph URL" is a red herring.  The image on that URL is inaccessible except to individuals who know its exact address.  *See* Aff. of Eric Pairel, attached as Exhibit E, at ¶¶ 5-7.  MRCTV did not provide a link to this URL and it was not searchable on any Internet search engine—thus it is like keeping a copy of the photograph in a file cabinet.  *See id.* at ¶¶ 4-7.  As such, MRC did not publicly display the image on that URL so as to trigger the attribution requirement in the nonexclusive Creative Commons license that Philpot granted as to Kid Rock Photograph.  *See* Dkt. No. 28-1 at Ex. I.  Thus, Philpot cannot argue that MRC breached the nonexclusive Creative Commons license by failing to attribute the image and he is precluded from suing MRC for copyright infringement relating to the Kid Rock Photograph URL.

Philpot may quibble over MRC's use of the word "majority," but he cannot deny that over 50% of the Kid Rock Photograph was cropped out to form the image of Kid Rock used in the Senate Article.  *Compare* Dkt. No. 26-1 at Ex. A-2 *with* Dkt. No. 1 at Ex. C.  That fact alone distinguishes MRC's use of the Kid Rock Photograph from the use in *Balsley v. LFP, Inc.* where there was only "minor cropping."  691 F.3d 747, 759 (6th Cir. 2012).

Finally, Philpot's contention that MRC did not "change the meaning" of the Kid Rock Photograph by cropping out over 50% of the image, resizing it, and inserting the headline "Kid Rock Announces 2018 U.S. Senate Bid," is counterintuitive.  Without these alterations, the Kid

Rock Photograph (taken in 2013) conveys nothing about the musician's bid for the Senate five years later.  Therefore, the Court should find that MRC's use of the Kid Rock Photograph was not only transformative as to the purpose but also physically transformative.

> 4. The Fact That MRC's Articles Generated a Minimal Amount of Ad-Based Revenue and Donations Does Not Sufficiently Support That MRC's Use of the Photographs Did Not Serve a Commercial Purpose

"The more transformative the new work, the less will be significance of other factors, like commercialism, that may weigh against a finding of fair use."  *See Campbell,* 510 U.S. at 579.  Nevertheless, the Opposition discusses the issue of commercial use in great detail.  Citing to *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), Philpot boldly asserts that "[c]ommercial use is generally not fair use." Dkt. No. 28 at 13-14.  He then argues that "MRC engaged in a commercial use of the Photographs because it exploited the Photographs to increase its advertising and donation revenue."  *Id.* at 15.

However, the Opposition misses the mark.  MRC admits that it received a negligible amount of revenue attributable to advertisements run on the webpage displaying the Pro-Life and Senate Articles (less than $30 total), and that it received approximately $50 in donations from visitors to the MRCTV during the time in which the Senate Article was displayed.  MRC Fact Nos. 34, 55-56.  None of that approximately $80 can be attributed to the use of the photographs. To the contrary, MRC has found that its articles draw more viewers for catchy headlines rather than catchy photographs within the articles themselves. Exh. F at pp.141:3-13; 142:7-20.

Significantly, MRC did not use the Chesney and Kid Rock Photographs for the purpose of generating more revenue/donations.  As Philpot acknowledges in his Opposition, MRC could have used any image of Kenny Chesney and Kid Rock in the Pro-Life and Senate Articles.  Dkt.

No. 28 at 21-22.  In fact, when MRC was first notified of Philpot's dispute over the use of these images, it removed and replaced the images.  MRC Fact No. 32, 52-53.

Regardless, *Sony* did not establish a *per se* rule that a commercial use bars a finding of fair use.  *Campbell*, 510 U.S. at 585 ("The Court of Appeals' elevation of one sentence from *Sony* to a per se rule . . . runs as much counter to *Sony* itself as to the long common-law tradition of fair use adjudication.").  "If . . . commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107," which "'are generally conducted for profit in this country.'"  *Id.*, 510 U.S. at 584 (citation omitted); *accord American Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 921 (2d Cir. 1994) ("Since many, if not most, secondary users seek at least some measure of commercial gain from their use, unduly emphasizing the commercial motivation of a copier will lead to an overly restrictive view of fair use.").

*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009), is illustrative of how the commercial aspect of a use is insignificant where the use is transformative. Involving a web-based system which would digitally store student's works to evaluate the originality of other works, the students in *iParadigms* complained that the district court "ignored the commercial nature of iParadigms' use of their materials, highlighting the fact that iParadigms is a for-profit company that enjoys millions of revenue dollars based on its ever-increasing database of student works." *Id.* at 638.  However, the Fourth Circuit disagreed, holding that the district court properly "determined that the commercial aspect was not significant in light of the transformative nature of iParadigms' use." *Id.* at 639.

Here, as in *iParadigms*, the Court should hold that MRC's transformative use of the photographs outweighs any commercial gain.  There no dispute that these articles were published

to provide political commentary and news reporting—quintessential of fair use under the Act. Allowing minimal incidental revenue of less than $80 to outweigh the obvious transformative use of these photographs would be to adopt an overly restrictive view of fair use.

### B. Second Fair Use Factor: This Factor Weighs in MRC's Favor Because MRC's Use Was for Factual Identification Purposes

The second fair use factor, the "nature of the copyrighted work," is of "limited usefulness" where the new work is being used for a transformative purpose. *Bouchat 2010*, 619 F.3d at 315. Yet, "the Supreme Court has instructed that 'fair use is more likely to be found in factual works than in fictional works.' " *iParadigms*, 562 F.3d at 640.

Although Philpot concedes that this factor is neutral in the Court's analysis of fair use, he is inconsistent on whether his photographs are "factual" or "creative." He argues that his photographs are creative in his discussion of the second fair use factor, *see* Dkt. No. 28 at 23, but insists that his photographs were intended merely for identification purposes in his discussion of the first fair use factor. *See id.* at 19 ("Philpot intended, among other things, for licensees to use the [photographs] to clearly identify Chesney and Kid Rock . . . ."). Philpot cannot have it both ways. MRC's use was only for identification, the photographs are merely factual works, thus the second fair use factor weighs in MRC's favor.

### C. Third Fair Use Factor: This Factor Is, at Most, Neutral to the Court's Fair Use Analysis in Light of MRC's Transformative Use

The third fair use factor, the "amount and substantiality of the portion used," is of minimal importance. Where the use of the work is transformative, wholesale copying does not preclude a finding of fair use. *See, e.g., Bouchat 2013*, 737 F.3d at 943; *Bill Graham*, 448 F.3d at 613. Although Philpot claims that MRC used the entire Chesney Photograph, there can be no dispute that MRC cropped out over 50% of the Kid Rock Photograph. Therefore, this factor is, at most, neutral to a fair use finding in light of MRC's transformative use of the photographs.

**D.** **Fourth Fair Use Factor**: There Was No Market for Philpot's Photographs; Thus, This Factor Weighs Heavily in Favor of a Finding of Fair Use

Under the fourth fair use factor, the Court must analyze "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  As held by the Fourth Circuit, in evaluating this factor, the Court must determine whether the challenged use of the work would "materially impair the marketability of the work" and whether the use would "act as a market substitute" for the original works.  *Bouchat 2013*, 737 F.3d at 943.

In its Motion, MRC demonstrated that there was no market for the photographs.  In response, Philpot admitted each of the supporting material facts that MRC offered, including:

➢ After taking the Chesney and Kid Rock Photographs, but before MRC's use, Philpot uploaded the photographs onto the Wikimedia website, which were then available for anyone to use subject to a nonexclusive Creative Commons license granted by Philpot.  MRC Fact Nos. 18-19, 39-40.

➢ By means of the Creative Commons license, Philpot granted a nonexclusive license for individuals and businesses to use the Chesney and Kid Rock Photographs without paying Philpot any fee.  MRC Fact No. 20, 41.

➢ Philpot does not know how many times he has licensed the use of or given permission for the use of the Chesney or Kid Rock Photographs to another individual or business.  MRC Fact Nos. 22, 43.

➢ The only money that Philpot has ever been paid in connection with the Chesney or Kid Rock Photographs has been in settling copyright infringement lawsuits.  MRC Fact Nos. 23, 44.

*Compare* Dkt. No. 26 at 5-6, 8-9 *with* Dkt. No. 28 at 2-4.  As such, it is undisputed that MRC's use did not "impair the marketability" of the photographs because no market existed.

Moreover, MRC demonstrated that the image of Kid Rock that appeared in the Senate Article could never "act as a market substitute" for the Kid Rock Photograph.  Dkt. No. 26 at 25-26.  As Philpot's Opposition is silent on this point, the Court may treat this issue as conceded.[3]

---

[3]     *See, e.g., Day v. D.C. Dep't of Consumer & Regulatory Affairs*, 191 F.Supp. 2d 154, 159 (D. D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.").

1.   Philpot Cannot Argue That the Nonexclusive Licenses Do Not Apply, but
Then Rely on the Attribution Provision in the Nonexclusive Licenses to
Manufacture an Artificial "Market" for His Photographs

With respect to the nonexclusive licenses, Philpot attempts to have his cake and eat it too
– denying their existence when it suits his purposes and relying on them elsewhere.  For instance,
in responding to MRC's license defense, Philpot argues that the licenses did not cover MRC's
use of the photographs, or alternatively, that the licenses terminated upon MRC's failure to
properly attribute Philpot.  *See* Dkt. No. 28 at 8-11.  Yet, in discussing the fourth fair use factor,
Philpot insists that, even though he never received any licensing fee in connection with the
photographs, "the requirement of attribution as a condition for lawful use of a copyrighted work
provides a meaningful benefit to the copyright owner."  *Id.* at 24.

However, the nonexclusive licenses either apply or do not apply.  This presents Philpot
with a veritable catch-22 in responding to MRC's Motion for Summary Judgment.  Either, the
nonexclusive licenses apply and Philpot is precluded from asserting a copyright infringement
claim.  *See Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) ("A copyright owner who grants
a nonexclusive license to use his copyrighted material waives his right to sue the licensee for
copyright infringement.").  Or, the nonexclusive licenses do not apply and Philpot is left with no
argument showing any effect upon the potential market for his photographs.  If the nonexclusive
licenses do not apply, then Philpot cannot argue that an attribution requirement in a license
creates a market that is protected under copyright law.  Notably, the Act does not set forth any
obligation for a licensee to credit an author of a copyrighted work. *See generally* 17 U.S.C. §
106A; *Graham v. James*, 144 F.3d at 236 (finding that failure to credit the author with the
copyright "did not itself amount to copyright infringement").  Philpot merely has the right to
"claim authorship" over the photographs.  17 U.S.C. § 106A(a).

Philpot's citation to *Jacobsen v. Katzer*, 535 F.3d 1373 (Fed. Cir. 2008), is inapposite. Most notably, *Jacobsen* did not even involve the "fair use" defense.  The plaintiff was an "open source software group" that created a computer programming application which it dedicated to the public free of charge subject to an "open source" or public license.  *Jacobsen*, 535 F.3d at 1376.  In reversing the district court's denial of a preliminary injunction for copyright infringement, the Federal Circuit stated that the copyright owner's license was "limited in scope" and that the alleged infringer's use was outside the scope of that license, permitting a claim for copyright infringement.  *Id.* at 1380.  Philpot's conveniently ignores portions of that Opinion that discusses the potential economic benefit to the copyright holder in that case.  For the computer programing group, there was a clear economic motive for requiring attribution, including "generat[ing] a market share" for the group's programs, increasing its reputation for future programs, and improvement to its software.  *Id.* at 1379.

Here, unlike the computer software group in *Jacobsen*, Philpot has no "economic motive" for requiring attribution when using his photographs.  Rather, it is undisputed that the only money that Philpot received has been in settling copyright infringement lawsuits.  MRC Fact Nos. 23, 44.  Thus, MRC did not harm Philpot's "market" by failing to attribute the photographs to him – it helped to ***create*** it – which is insufficient to support the fourth fair use factor.  *See National Rifle Association of America v. Handgun Control Fed'n of Ohio*, 15 F.3d 559, 562 (6th Cir. 1994).

Regardless, any obligation of MRC to attribute the Chesney and Kid Rock Photographs to Philpot arises under the nonexclusive licenses that Philpot granted as to these photographs. Philpot even acknowledges that "the Creative Commons attribution license required that the licensee provide non-monetary compensation to Philpot through attribution."  Dkt. No. 28 at 2,

4.  If Philpot claims that the licenses did not apply to MRC's use, then MRC was under no obligation to attribute Philpot.  "'[U]ses that violate a license agreement constitute copyright infringement only when those uses would infringe in the absence of any license agreement at all.'"  *Lasica v. Am. Online, Inc.*, No. 15-cv-4230-GW, 2015 WL 12791494, at *3 (C.D. Cal. Oct. 8, 2015) (citation omitted).

Accordingly, Philpot cannot claim that MRC's failure to attribute negatively affected the potential market for his photographs.  There is no market to affect.

## II.   MRC Should Be Granted Summary Judgment on Its License Defense

The undisputed fact that Philpot granted nonexclusive licenses with respect to the Chesney and Kid Rock Photographs precludes him from filing a suit for copyright infringement. "A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Graham v. James*, 144 F.3d at 236.  Only where "a license is limited in scope and the licensee acts outside the scope" can "the licensor . . . bring an action for copyright infringement." *Jacobsen v. Katzer*, 535 F.3d at 1380.

In its Motion for Summary Judgment, MRC demonstrated that Philpot granted nonexclusive Creative Commons licenses for anyone to share and adapt his works when he placed the photographs on Wikimedia.  Dkt. No. 26 at 11-13.  Not only were the licenses "nonexclusive," but they were not "limited in scope."  *Id.* at 12.

In his Opposition, Philpot admits that, when he uploaded the Chesney and Kid Rock Photographs onto Wikimedia, he granted nonexclusive Creative Commons licenses for others to share and adapt these photographs.  *See* Dkt. No. 28 at 2, 3-4.  Nevertheless, he asserts three arguments against MRC's license defense.  *See id.* at 8-11.  First, Philpot complains that MRC testified that it did not "obtain a license" for its use of the Chesney and Kid Rock Photographs. *Id.* at 8. Second, imposing contract formation requirements onto his nonexclusive licenses,

Philpot argues that the licenses do not apply because MRC was not "a party to the Creative

Commons attribution license" and that there was no "meeting of the minds" regarding the terms

of the licenses.  *Id.* at 8-9.  And third, Philpot claims that, even if the licenses applied, they

nonetheless terminated automatically when MRC displayed the contested images in the Pro-Life

and Senate Articles without proper attribution.  *Id.* at 9-11.

Regarding the first and second arguments, the Opposition confuses the legal concepts of a

"license" versus a "contract."  Although licenses should be interpreted in a similar manner as

contracts are interpreted, licenses are not contracts.  A "license" is nothing more than permission

to use a copyrighted work in a particular manner.  *Saxelbye Architects, Inc. v. First Citizens Bank

& Tr. Co.*, No. 96-2766, 1997 WL 702290, at *3 (4th Cir. Nov. 3, 1997) ("A 'nonexclusive

license' is the permission to use a copyrighted work in a particular specified manner. . . .").

Unlike contracts, licenses do not require consideration or a meeting of the minds.  In fact, "[a]

nonexclusive license may be granted unilaterally by a copyright holder." *Crump v. QD3 Entm't,

Inc.*, No. 10-civ-3564, 2011 WL 446296, at *4 (S.D. N.Y. Feb. 8, 2011) (citation omitted).

Notably, if licenses were subject to the same formation requirements as contracts, Creative

Commons licenses would not even exist.

Here, Philpot granted a "worldwide, royalty-free, nonexclusive, perpetual" license to

reproduce and adapt his works. Dkt. 28-1 (Dunnegan Decl.) Ex. I at § 3.  As such, MRC was not

required to take any action to "obtain" or become a "party" to the licenses.

Regarding the third argument, Philpot is correct that the nonexclusive Creative Commons

licenses terminate automatically upon a licensee's breach.  *See id.* at § 7.a.  However, under

these circumstances, Philpot cannot demonstrate that MRC breached the licenses.  Indeed, the

licenses do not strictly require attribution in all instances.  For instance, the Creative Commons

licenses expressly excepted any use permitted under copyright law, including fair use. *Id.* at § 2

("Nothing in this License is intended to reduce, limit, or restrict any uses free from copyright or

rights arising from limitations or exceptions that are provided for in connection with the

copyright protection under copyright law or other applicable laws."). *Id.* Here, MRC's use of

the photographs was compliant with the licenses because its use of the photographs constitutes

fair use, permitted under copyright law.

### III.    An Award of Attorneys' Fees Is Particularly Appropriate in Light of Philpot's Failure to Acknowledge the Nonexclusive Licenses in His Initial Pleading

Section 505 of the Copyright Act expressly provides that the Court, in its discretion, may

allow the recovery of "full costs" against any party.  17 U.S.C. § 505.  Such costs may include

awarding a reasonable attorney's fee "to the prevailing party." *Id.*

Since the inception of this lawsuit, Philpot has played "hide the ball" with his granting

nonexclusive licenses as to the Chesney and Kid Rock Photographs.  In the Complaint, Philpot

does not even mention the licenses, alleging that he "never licensed" the Chesney and Kid Rock

Photographs to MRC and that MRC did not have Philpot's permission to copy or display the

photographs.  Dkt. No. 1 at ¶¶ 15, 19.  Now, in his Opposition, Philpot does not even dispute that

he did grant nonexclusive licenses to his photographs. Rather, he argues that the "worldwide,

royalty-free, nonexclusive, perpetual" licenses somehow excluded MRC.  Not so.

Had Philpot been forthright with the license issue, MRC could have disposed of this

matter at the pleading stage.  Instead, by design, Philpot survived the pleading stage and forced

the parties to engage in discovery, including multiple depositions, and otherwise continued to

litigate this matter to conclusion.  MRC submits that Philpot should not be rewarded for

engaging in such tactics and respectfully requests that it be awarded its reasonable attorneys' fees

should the Court grant the Motion for Summary Judgment.

## <u>CONCLUSION</u>

WHEREFORE, for the forgoing reasons, summary judgment in this matter should be entered in favor of MRC and against Plaintiff, and MRC should be permitted to file a petition for its reasonable attorneys' fees pursuant to 17 U.S.C. § 505.


Dated: November 22, 2017                    Respectfully Submitted,

*/s/ David A. Warrington*
David A. Warrington (VSB 72293)
Alexander R. Green (VSB 83937)
LeClairRyan, A Professional Corporation
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Phone: (703) 647-5926
Facsimile: (703) 647-5966
david.warrington@leclairryan.com
alexander.green@leclairryan.com
***Counsel for Media Research Center Inc.***

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on November 22, 2017, I electronically filed the foregoing

with the Court's CM/ECF system, which will send a copy of the foregoing on the following.

Peter J. Riebling
1717 Pennsylvania Avenue, N.W.
Suite 1025
Washington, D.C. 20006-3591
peter.riebling@rieblinglaw.com
*Counsel for Larry Philpot*

*/s/ David A. Warrington*
David A. Warrington
LeClairRyan, A Professional Corporation
2318 Mill Road, Suite 1100
Alexandria, Virginia 22314
Phone: (703) 647-5926
Facsimile: (703) 647-5966
david.warrington@leclairryan.com
**Counsel for Media Research Center Inc.**

22